**Ethel JUGLE, Administrator of the Estate of Jay G. Jugle, Ethel Jugle, individually and as Mother and next-of-kin of Jay G. Jugle, Plaintiffs,**

v.

**VOLKSWAGEN OF AMERICA, INC., Defendant.**

No. 2:93–CV–151.

United States District Court, D. Vermont.

Aug. 12, 1997.

Gary W. Lange, Swanson & Lange, Burlington, VT, for Plaintiff.

Michael S. Sher, Ropes & Gray, Boston, MA, for Defendant.

## OPINION AND ORDER

SESSIONS, District Judge.

In this products liability diversity action, Plaintiff Ethel Jugle ("Jugle") alleges that her son Jay Jugle suffered fatal injuries from a fire caused by design defects in his 1986 Volkswagen Jetta automobile. Pending before the Court is a motion for summary judgment by Defendant Volkswagen of America, Inc. ("Volkswagen"), and Volkswagen's related motion in limine to exclude the opinion testimony of Jugle's proposed experts.

## I. BACKGROUND

The following facts are undisputed. Sometime before 2:55 a.m. on the morning of January 8, 1991, Jay Jugle was in his 1986 Volkswagen Jetta GLI ("Jetta," "Jugle Jetta"), with the engine running. At approximately 2:55 a.m., a fire ignited on the external underbody of the vehicle. About fifteen minutes later, a passing taxi driver observed the fire, and made an emergency call through his dispatcher. Burlington police and fire department officials arrived within several minutes. Soon after their arrival, the intensity of the fire rapidly grew. Upon extinguishing the fire, police and fire department personnel discovered Mr. Jugle in the driver's seat of the car, with his torso slumped into the passenger's seat. Mr. Jugle had suffered severe burn injuries in the fire, and was taken to the Medical Center Hospital of Vermont, where he died on February 20, 1991 from his burn injuries and resulting complications.

Earlier that evening, Mr. Jugle and several friends had been drinking in at least two local bars. Mr. Jugle had several drinks over the course of the evening. When tested at the hospital after the fire, his blood alcohol content was 0.44 g/dl.

Mr. Jugle had purchased the Jetta from Christopher Ives on or about August 10, 1990. Mr. Ives had purchased the vehicle, in a used condition, from Sutton Porsche–Audi–Volkswagen of Flemington, New Jersey on or about September 8, 1986.

Plaintiff Ethel Jugle is the mother and next of kin of Jay Jugle. Defendant Volkswagen is a New Jersey corporation which has conducted business in Vermont during all times relevant to this case. Jugle filed suit against Volkswagen on February 17, 1993, alleging five counts: negligence; breach of warranty; strict products liability; wrongful death; and punitive damages. The negligence claim was subsequently withdrawn.

Jugle has advanced two designated experts, Dean Jacobson, Ph.D., and Lee S. Cole, each of whom is prepared to testify regarding the origin and cause of the fire. In addition to inspecting the Jugle Jetta, Dr. Jacobson subjected a 1986 Jetta exemplar to thermal testing of the catalytic converter, exhaust pipe, and fuel lines. He used a second exemplar to study and test the thermal properties of several floor panels and their interior coating. Based on the observations and data recorded during his examinations of the Jugle vehicle, the exemplars, testimonial evidence, documentary evidence, and selected literature, Dr. Jacobson concluded that the fire started in the area of the catalytic converter/exhaust system, and that a polyethylene wax used on the inner floor pan of the Jugle car was either ignited by heat from the catalytic converter, or acted as an accelerant for a fire started around the catalytic converter. The fire spread along the underbody of the vehicle, ultimately breaching one or more of the plastic fuel lines of the car. Thus, Dr. Jacobson concluded, the use of the polyethylene wax in conjunction with plastic fuel lines and a plastic fuel tank constituted a design defect in the vehicle. Dr. Jacobson also concluded that in light of these design defects, the warnings accompanying the vehicle were inadequate.

Mr. Cole conducted tests on the plastic fuel lines of an exemplar Jetta to determine the thermal characteristics of the lines. Based on his experiments as well as his examination of the Jugle Jetta and corroborating statements of witnesses at the scene of the fire, Mr. Cole concluded that the heat build-up in the catalytic converter and exhaust surface caused the plastic fuel and vapor lines to melt, and alternatively, that the heat from the catalytic converter ignited the undercoating 9f the vehicle which in turn melted the fuel and vapor lines. However,

Mr. Cole's primary theory is contradicted by Dr. Jacobson. Through extensive stationary operation of the vehicle, Dr. Jacobson achieved catalytic converter temperatures in excess of 890° F. Even at these temperatures, the fuel lines never reached temperatures in excess of 160° F. far short of the 350° F melting point of the fuel lines.

Volkswagen moved for summary judgment on February 14, 1997, and Jugle opposed the motion. In addition, Volkswagen has made a motion in limine to exclude the opinion testimony of Dr. Jacobson and Mr. Cole, which Jugle also opposes. The grounds for the motion in limine are essentially identical to Jugle's argument on summary judgment regarding the testimony of Dr. Jacboson and Mr. Cole. Therefore, the Court addresses the motions in tandem.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when the Court finds that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The party opposing summary judgment may not rest on its pleadings but must present "significant probative evidence" demonstrating that a genuine dispute of material fact exists, and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The Court must view all materials submitted in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor. *Id.* at 255, 106 S.Ct. at 2513–14.

### B. Admissibility of Jugle's Expert Witness Testimony Under Rule 702

Volkswagen's principal argument for summary judgment, and in support of its motion in limine, is that the testimony of Jugle's designated experts must be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that without such testimony, Jugle's breach of implied warranty and strict products liability claims fail as a matter of law.[1]

Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. Volkswagen does not now challenge Dr. Jacobson or Mr. Cole's qualifications as experts, but instead contends that their proposed testimony fails the standard for admissibility of scientific evidence articulated by the Supreme Court in *Daubert*.

In *Daubert*, the Court interpreted Rule 702 as requiring trial judges to perform a "gatekeeper" role by determining whether proffered scientific testimony is "(1) scientific knowledge, and (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592, 113 S.Ct. at 2796. This requires an inquiry into the reliability and relevance, or "fit," of the scientific evidence. *Id.* Prior to *Daubert*, the vast majority of courts applied the so-called *Frye*-test in determining the admissibility of expert testimony based on novel scientific techniques, and excluded such testimony unless the techniques had gained "general acceptance" in the relevant scientific community. *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); see *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995). The Court held in *Daubert* that the Federal Rules of Evidence had superseded the *Frye* test, and that general acceptance, while still relevant, is no longer determinative. Instead, trial judges are now to assess the validity and applicability of the reasoning or methodology underlying proffered scientific testimony by considering, among other factors: (1) its ability to be tested; (2) whether it has been subjected

1. Volkswagen had also argued that in the absence of Dr. Jacobson and Mr. Cole's testimony, Jugle could not establish a claim for negligence. However, Jugle has since withdrawn her negligence claim.

to peer review and publication; (3) its potential rate of error; and (4) whether it has gained general acceptance in the relevant scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97. Ultimately, the inquiry is a "flexible" one, and the focus must be "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 580, 113 S.Ct. at 2790.

*Daubert* involved the admissibility of novel scientific evidence, which had not found "general acceptance" among the relevant scientific community, linking the drug Bendectin to certain birth defects. In contrast, Volkswagen does not contend that Dr. Jacobson and Mr. Cole's proffered testimony is based on novel scientific techniques, nor could it plausibly do so based on the record before the Court.[2] Rather, Volkswagen argues that the testimony in question fails when tested against *Daubert's* four factors. However, some courts, including the Second Circuit, have commented that *Daubert's* focus was on the admissibility of novel or unorthodox scientific evidence under Rule 702. *See, e.g., Iacobelli Constr. Inc. v. County of Monroe,* 32 F.3d 19, 25 (2d Cir.1994) (affidavits of geotechnical consultants regarding construction site conditions, contract, and construction results based on analysis of bid documents, geotechnical data, and geotechnical interpretive reports "do not present the kind of 'junk science' problem that *Daubert* meant to address"); *Lappe v. American Honda Motor Co.,* 857 F.Supp. 222, 228 (N.D.N.Y. 1994) (*"Daubert's* narrow focus is on the admissibility of 'novel scientific evidence' under Fed.R.Evid. 702. . . . . *Daubert* only prescribes judicial intervention for expert testimony approaching the outer boundaries of traditional scientific and technological knowledge"), *aff'd,* 101 F.3d 682 (2d Cir.

1996); *see also Golod v. La Roche,* 964 F.Supp. 841, 848 (S.D.N.Y.1997) (quoting *Lappe).*

In *Iacobelli,* for example, the Second Circuit declined to apply the four factors, and instead concluded that the experts in that case had "rel[ied] upon the type of methodology and data typically used and accepted in construction-litigation cases." 32 F.3d at 25. Similarly, in *Smith v. Ford Motor Co.,* 882 F.Supp. 770, 774 (N.D.Ind.1995), a case much like the present one involving the admissibility of expert testimony on the cause of an automobile fire, the court held that "[i]n cases where a novel scientific theory or technique is presented, these four factors are effective means of determining whether such a theory or technique 'will assist the trier of fact to understand or determine a fact in issue.' " However, the *Smith* court held that the four factors were "not readily applicable" in that case because the expert's testimony was based not on novel scientific evidence, but instead on "facts, an investigation, and traditional automobile body repair and fire and accident investigation expertise," which the court concluded met the requirements of Rule 702. *Id.*

■ Because the opinions of Dr. Jacobson and Mr. Cole are not based on novel scientific techniques, the Court need not test their opinions against *Daubert's* four factors. As noted by the court in *Smith,* the four factors, while helpful to the reliability and fit inquiries of Rule 702 in cases involving novel scientific evidence, are often not especially useful in cases of orthodox scientific methodology. The Court must, however, still assess the reliability and fit of the proposed experts' opinions. *Daubert,* 509 U.S. at 592 n. 11, 113 S.Ct. at 2796 n. 11.[3]

---

2. As Dr. Jacobson states, and as is reflected in his written report, his conclusions and opinions are "derived from the observations and data that were noted and recorded during the course of the Subject Vehicle (SV) technical examinations, exemplar vehicle testing and examinations, exemplar original equipment manufactured components and materials, testimonial evidence, documentary evidence, selected literature and OEM/Supplemental technical data that would normally be relied upon in the scope of automotive fire analysis which result in conclusions/opinions that are within a reasonable de-

gree of scientific and engineering certainty." Jacobson Report at 7 (Paper No. 103, Exh. E). Similarly, Mr. Cole's report reflects that his conclusions are drawn from his inspection of the Jugle Jetta, his testing of component exemplars, and his expertise in fire inspection. Cole Report (Paper No. 103, Exh. L).

3. "Although the Frye decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence. Of course, well established propositions

Volkswagen has challenged the proffered testimony of Dr. Jacobson and Mr. Cole on several grounds, including inadequacies in their testing of exemplars, differences in testing conditions, the fact that the tests were designed and performed exclusively for this litigation, and the lack of pre-existing or independent research to support their theories. Regardless of the validity of these claims, they do not implicate the underlying scientific methodology that Dr. Jacobson and Mr. Cole followed. Drawing all inferences in favor of Jugle, the nonmoving party, the Court finds that the proffered testimony of both Dr. Jacobson and Mr. Cole, based as it is on their respective observations, investigations, testing and expertise, meets the requirements of Rule 702 and is therefore admissible.[4] However, the Court is troubled by the apparent contradiction between the proposed testimony of Dr. Jacobson and Mr. Cole, and is far from certain as to what these experts will actually say when on the witness stand. As such, the Court will revisit this issue at trial, and will hold a hearing, pursuant to Fed.R.Evid. 104(a), to consider the admissibility of the proffered testimony in light of the facts presented at that time.

Because the proffered testimony of Dr. Jacobson and Mr. Cole is admissible under Rule 702, Volkswagen's argument that Jugle cannot establish her claims of breach of implied warranty or strict products liability fails.

## C  Breach of Warranty Claims

Volkswagen argues next that Jugle's breach of warranty claims are barred by the statute of limitations, as provided by Vt. Stat. Ann. tit. 9A § 2–725 (1966). However, as Jugle correctly argues, the statute of limitations governing this case is provided by Vt. Stat. Ann. tit. 12 § 512(4) (Supp.1996), under which Jugle's claim was timely filed.

Section 2–725, taken from the Uniform Commercial Code, provides in relevant part:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. A breach of warranty occurs when tender of delivery is made. . . .

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.

Vt. Stat Ann. tit. 9A § 2–725. Section 512 provides as follows:

Actions for the following causes shall be commenced within three years after the cause of action accrues, and not after:

\*      \*      \*      \*      \*      \*

(4) Except as otherwise provided in this chapter, injuries to the person suffered by the act or default of another person, provided that the cause of action shall be deemed to accrue as of the date of the discovery of the injury.

Vt. Stat. Ann. tit. 12 § 512. The Jugle vehicle was tendered by Volkswagen to its previous owner on or about September 8, 1986, and the present action was commenced on February 17, 1993. Thus, the breach of warranty claim is barred if § 2–725 applies, but not if § 512(4) governs.

The Court concludes that under *Kinney v. Goodyear Tire & Rubber Co.*, 134 Vt. 571, 367 A.2d 677 (1976), § 512(4) is the governing statute of limitations. In *Kinney*, the plaintiff claimed personal injuries caused when a tire he was mounting for its purchasers exploded, and sought recovery on the basis of breach of express and implied warranties by the tire manufacturer and retailer. At issue was whether § 512(4) or Vt. Stat Ann. tit. 12 § 511 (1973), the general six-year statute of limitations for civil actions, should govern. The Vermont Supreme Court held that although a breach of warranty—or breach of contract—was alleged, § 512 is "predicated upon the nature of the harm for which recovery is sought and not upon the nature of the action brought." 134 Vt. at 575, 367

---

are less likely to be challenged than those that are novel, and they are more handily defended . . . "

**4.** Of course, Volkswagen may still raise the short-comings of Dr. Jacobson and Mr. Cole's tests and theories at trial. As stated in *Daubert,* "Vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596, 113 S.Ct. at 2798.

A.2d at 680. Since the plaintiff had suffered a personal injury allegedly due to the acts or defaults of the defendants, the court held that the three-year statute of limitations applied.

Volkswagen contends that *Kinney* is not controlling because it dealt only with § 511 and § 512(4), and did not involve the applicability of § 2–725 of the U.C.C. However, in a case that did address the conflict between § 2–725 and § 512, the Vermont Supreme Court held that contractual privity was necessary for § 2–725 to apply. *Aube v. O'Brien*, 140 Vt. 1, 433 A.2d 298 (1981). *Aube* involved a claim for breach of express and implied warranties of fourteen cows sold as dairy cattle but which were infected with brucellosis. Although the court concluded that § 2–725 applied rather than § 512, it specifically noted that the plaintiff and defendant were in privity. It noted further that "central to the Court's decision" in *Kinney* was the absence of contractual privity between the parties. *Id.* at 5, 433 A.2d at 300. "The [*Kinney*] opinion concluded that 'the allegation of express warranty is not controlling, because the facts set forth show no contractual relationship whatever between plaintiff and defendants.'" *Id.* (quoting *Kinney*, 134 Vt. at 576, 367 A.2d at 680).

The present case is analogous to *Kinney* in that Jay Jugle and Volkswagen were not in contractual privity. Moreover, as in *Kinney*, Jay Jugle suffered personal injuries allegedly as a result of the defendant's acts and omissions. Thus, Jugle's claims are primarily tortious in nature, and § 512(4) applies. Jugle's breach of warranty claims are therefore not barred by the statute of limitations.

In addition to its statute of limitations argument, Volkswagen contends that Jugle's claim of breach of express warranty must fail because Jugle has failed to identify any express warranty on which it is relying. Indeed, Jugle appears to have abandoned its express warranty claim, and the court therefore deems it waived.

### D. Breach of Duty to Warn Claim

■ As part of its strict products liability claim, Jugle has alleged that Volkswagen breached a duty to warn Jay Jugle of the dangers involved in using the Jetta. In order to establish a breach of duty to warn, "the plaintiff must prove not only that the lack of warning made the product unreasonably dangerous and hence defective, but the plaintiff also has the burden of showing that the lack of warning was the proximate cause of the injury." *Menard v. Newhall*, 135 Vt. 53, 54, 373 A.2d 505, 505 (1977). If, however, a defendant has a duty to warn and fails to do so, a presumption arises that the user of the product would have read the warning and heeded it. *Id.* A duty to warn exists "when the product manufactured is dangerous to an extent beyond which would be contemplated by the ordinary purchaser." *Id.* at 55, 373 A.2d at 507.

Volkswagen contends that Jugle has failed to create a triable issue as to this claim because Jugle's expert witness on warnings could not articulate an adequate warning, and because he did not opine that any warning would have changed Jay Jugle's behavior and thereby prevented his injuries. Put another way, Volkswagen claims that Jugle's claim is inadequate because Jugle (1) fails to demonstrate that the lack of warning is unreasonably dangerous, and (2) fails to show causation.

■ Viewing the facts in the light most favorable to Jugle, the Court concludes that Dr. Jacobson has offered an alternative warning that he deems adequate, and has thereby demonstrated a factual dispute as to whether the lack of such a warning made the automobile unreasonably dangerous. Dr. Jacobson's report contains the following statement:

The Owner's Manual information *warns* about overheating, combustible materials coming into contact with a hot exhaust system, and undercoating overheating and causing a fire. The headliner decal *cautions* against high temperatures burning the coating material, and against operating the vehicle where combustible materials can contact a hot exhaust system.

These warnings are defective in that they do not portray the true consequences of the hot exhaust system, fuel fed fire. The *dangers* associated with a fire involv-

ing the plastic gasoline lines and plastic gasoline tank is [sic] ignored. The consequences of a gasoline fire with resultant death should be clearly stated on both the decal and in the Owner's Manual.

Jacobson Report at 11 (Paper No. 103, Exh. E). In addition, Dr. Jacobson has stated that an adequate warning would need to state the potential for death resulting from fire caused by an idling car. Jacobson Deposition at 87–88 (Paper No. 112, Exh. A).

■ A factual dispute exists with regard to causation as well. In deposition, Dr. Jacobson stated, "[I]t's possible that had the proper danger information been provided relative to death from fire being cause by an idling car, that they may have also changed [Jay Jugle's] behavior, in that he would not have chosen to start the car up and stay in it while it was idling...." Jacobson Deposition at 93 (Paper No. 112, Exh. A). The fact that this opinion is expressed in terms of possibilities is irrelevant because when viewed in the light most favorable to Jugle, it demonstrates a factual dispute. Moreover, because a failure to warn gives rise to a presumption of causation, *Menard,* 135 Vt. at 54–55, 373 A.2d at 505, a factual dispute regarding the failure to warn precludes summary judgment regardless of any evidence of causation. Dr. Jacobson's opinions on whether Volkswagen has breached its duty to warn illustrate such factual dispute, which only a jury, as the finder of fact, may resolve.

### E. Jay Jugle's Intoxication as Proximate Cause of His Injuries

■ Volkswagen has also argued that it is entitled to summary judgment because Jay Jugle's injuries were proximately caused by his own intoxication, and not by any product defects in the vehicle. Alternatively, Volkswagen argues that Jay Jugle's negligence exceeded that of Volkswagen, and therefore bars Jugle's suit.

5. Volkswagen bases its comparative negligence argument on Vt. Stat. Ann. tit. 12 § 1036 (Supp.1996), and cases cited thereunder. However, Jugle has withdrawn her negligence claim. The question remains whether § 1036 applies to strict products liability cases. The Vermont Supreme Court recently considered, and was unable to resolve, the question of

■ Summary judgment is inappropriate on these grounds. It is far from settled that Jay Jugle's intoxication was, as Volkswagen claims, the "sole and proximate cause" of his injuries. Moreover, even assuming that comparative negligence applies in this case,[5] the Court is unable to conclude, when viewing the facts before it in the light most favorable to Jugle, that Jay Jugle's alleged negligence exceeded that of Volkswagen.

### F. Availability of Punitive Damages

■ Finally, Volkswagen seeks summary judgment on Jugle's claim for punitive damages. Punitive damages are only available upon a showing of actual malice. *Shortle v. Central Vt. Pub. Serv. Corp.,* 137 Vt. 32, 33, 399 A.2d 517, 518 (1979). "This may be shown by conduct manifesting personal ill will or carried out under circumstances evidencing a reckless or wanton disregard of one's rights." *Id.; accord Wheeler v. Central Vt. Med. Ctr., Inc.,* 155 Vt. 85, 97, 582 A.2d 165, 171 (1989).

■ Even when taking all of Jugle's allegations as true, there is nothing to support a conclusion that Volkswagen acted with a reckless or wanton disregard for Jay Jugle's rights. The availability of punitive damages requires a greater level of culpability than any interpretation of the facts in this case permits. Therefore, Volkswagen's motion for summary judgment on Jugle's punitive damages claim is granted.

### III. CONCLUSION

Based on the foregoing analysis, Defendant's Motion for Summary Judgment (Paper No. 101) is hereby GRANTED in part and DENIED in part. Summary judgment is granted with regard to Plaintiff's claim of breach of express warranty and her claim for punitive damages, and is denied with regard to all remaining claims. Furthermore, De-

whether comparative negligence, either under § 1036 or independent of any statutory basis, generally applies in strict liability claims. *Webb v. Navistar Int'l Transp. Corp.,* 692 A.2d 343 (1996). This Court need not address the issue at this juncture because it finds that a factual dispute exists as to the degree of Jay Jugle's negligence, if any, in this case.

584

fendant's Motion In Limine to Exclude Opinion Testimony of Lee S. Cole and Dean Jacobson (Paper No. 105) is hereby DENIED.