**Michael L. BLANCHARD, individually, and as Administrator of the Estate of Ross Allen Blanchard, and as the Administrator of the Estate of Rene Marie Blanchard, Plaintiff,**

v.

**ELI LILLY & COMPANY, Defendant.**

**Jose G. Espinoza, individually, and as personal representative of the Estate of Elvira S. Espinoza, and Minnie T. Espinoza, Plaintiffs,**

v.

**Eli Lilly & Company, Defendant.**

**Nos. 2:99–CV–256, 2:99–CV–393.**

United States District Court,
D. Vermont.

March 29, 2002.

310

Arthur P. Anderson, Anderson & Buran, P.C., Burlington, VT, for Michael L. Blanchard.

Michael Frederick Hanley, Plante & Hanley, White River Junction, VT, Paul F. Waldner, Richard W. Ewing, Vickery & Waldner, Houston, TX, Arnold A. Vickery, Houston, TX, for Jose G. Espinoza, Minnie T. Espinoza.

Robert B. Hemley, Gravel and Shea, Burlington, VT, Michelle R. Mangrum, Erik M. Anielak, Andrew See, Margann M. Bennett, Shook, Hardy & Bacon, L.L., Kansas City, MO, Stephen E. Scheve, Shook Hardy and Bacon, Houston, TX, Paul D. Snyder, Polsinelli, White, Vardma Shalton, Kansas City, MO, for Eli Lilly & Co.

## OPINION AND ORDER

SESSIONS, District Judge.

This is a drug product liability case in which the Plaintiffs claim that Elvira Espinoza shot and killed her children and then committed suicide as a result of her ingestion of Prozac, an antidepressant manufactured by Defendant Eli Lilly & Company ("Lilly"). Before the Court are Lilly's motions for summary judgment on the grounds of lack of admissible expert testimony on causation and lack of probable cause. For the reasons stated below, Lilly's motions (Docs. 96 & 101) are granted.

### I. Background

For the purpose of resolving these summary judgment motions, the following facts are taken as true. On September 7, 1997 Elvira Espinoza ("Espinoza") shot her two children and immediately thereafter shot herself. All three died as a result of the gunshot wounds. At the time of her death and for some years previously, Espinoza was under treatment for depression and had been prescribed the antidepressant fluoxetine hydrochloride, commonly known as Prozac. During the last three months of her life, her dosage was increased from 20mg to 40 mg; however Espinoza was known to adjust her dosage as she saw fit, and it is uncertain how much Prozac Espinoza was taking when she died. Post mortem testing of Espinoza's blood revealed concentrations of Prozac and its metabolite norfluoxetine at ten times the approved therapeutic level.

Prozac is one of a class of drugs called selective serotonin reuptake inhibitors ("SSRIs"). There is medical and scientific evidence that SSRIs including Prozac are effective in treating major depressive disorders. This is because depression is associated with serotonin depletion in many people, and SSRIs are thought to increase the activity of the neurotransmitter serotonin in the brain.

Prozac is not effective for every patient suffering from depression however, and some patients have discontinued Prozac because of adverse side effects. For example, SSRIs may produce "extrapyramidal" side effects, described as abnormal bodily movement, such as "akathisia," a syndrome characterized by an inner sense of restlessness and an inability to sit or stand still. Roger M. Lane, *SSRI–Induced Extrapyramidal Side-effects and Akathisia: Implications for Treatment*, 12 J.Psychopharmacol. 192, 193 (1998). Mania (an abnormally elevated mood or irritability) or hypomania (a less severe form of mania) has been reported in a small proportion of patients treated with Prozac or other antidepressants. *See* Adrian Preda, et al., *Antidepressant–Associated Mania and Psychosis Resulting in Psychiatric Admissions*, 62 J.Clin. Psychiatry 30, 32 (2001). Antidepressant treatment may also trigger a "substance-induced mood

disorder with mixed features," in which symptoms of both mania and depression are present. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 4th ed. (1994).

Prozac was first sold in the United States in early 1988. In early 1990 an article was published in the American Journal of Psychiatry hypothesizing that Prozac might induce suicidal ideation in some people suffering from depression. Martin H. Teicher, et al., *Emergence of Intense Suicidal Preoccupation During Fluoxetine Treatment*, 147 Am.J. Psychiatry 207 (1990). The authors observed that six depressed patients who had not had serious suicidal thoughts before taking Prozac developed responses after beginning Prozac treatment that were characterized by intense, violent suicidal thoughts. *Id.* Akathisia has also been associated with the emergence of uncharacteristic suicidal ideation and behavior. Lane, 12 J.Psychopharmacol. at 193.

In 1991 Lilly submitted a draft protocol for a "rechallenge"[1] study of patients who developed suicidal ideation while under Prozac treatment to the Food and Drug Administration, but this study was not performed. Instead Lilly conducted a "meta-analysis" of the clinical trial database for Prozac, consisting of all double blind, randomized trials of Prozac controlled against placebos or tricyclic antidepressants, analyzing data from more than three thousand patients. Charles M. Beasley Jr. et al., *Fluoxetine and Suicide: a Meta-analysis of Controlled Trials of Treatment for Depression*, 303 Brit.Med.J. 685 (1991). The researchers concluded that the data did not show either increased risk of suicidal acts or the emergence of substantial suicidal ideation among patients treated with Prozac, relative to those receiving tricyclic antidepressants or placebos. *Id.*

According to her health care providers and her medical records, Espinoza was diagnosed with major depression and dependent personality disorder. There were significant psychosocial stressors in her life, including the breakup of her marriage, poverty, single motherhood, her belief that her ex-husband had abandoned their children, behavioral problems with the children, a threat of losing custody of them, academic difficulties in a nursing program she was pursuing, dissatisfaction with her appearance, and the absence of any intimate adult relationship upon which she could depend. She suffered mental anguish, self-loathing and hopelessness. Although at times in 1995 she had exhibited frantic, impulsive or aggressive behavior which could be described as hypomanic, in the days before her death she was calm and her behavior, including giving away possessions, suggested that she planned her suicide. She was not suffering from akathisia, a mixed state, mania, hypomania or from hypomanic symptoms at that time.

The Plaintiffs, Espinoza's ex-husband and her parents, obtained the opinion of psychiatrist and suicidology expert John T. Maltsberger, M.D. to determine the cause of this homicide-suicide. He is offered as their sole expert on causation. Dr. Maltsberger received his M.D. from Harvard University in 1959, and graduated from the Boston Psychoanalytic Institute in 1970. He completed postdoctoral training at Pennsylvania Hospital in Philadelphia, the Massachusetts Mental Health Center in Boston and the Boston Psychoanalytic Institute. He is an associate clinical professor of psychiatry at Harvard Medical

---

1. "Rechallenge occurs when a doctor re-exposes a patient to a drug believed to have caused an earlier adverse reaction." *Glastet-* *ter v. Novartis Pharms. Corp.,* 252 F.3d 986, 990 (8th Cir.2001).

School and an associate attending psychiatrist at McLean Hospital in Belmont, Massachusetts.

Dr. Maltsberger has a full-time clinical practice in psychotherapy and psychoanalysis. Many of his patients suffer from serious depressive illnesses. Some of them are actively suicidal. He has considerable experience in prescribing psychoactive drugs, including SSRI drugs generally and Prozac specifically. He has never had a patient under his care experience newly emergent suicidal thinking, attempt or commit suicide, or engage in violent assaultive behavior against anyone. He has not himself conducted any research on the question whether Prozac causes suicidal thoughts or violent behavior.

Dr. Maltsberger is a member and past president of the American Association of Suicidology, and belongs to the International Association for Suicide Prevention and the International Academy of Suicide Research. He has extensive teaching and consulting experience in the care and treatment of suicidal patients and has written numerous articles and edited and contributed chapters to several books on the subjects of suicide and suicidal patients. Dr. Maltsberger claims expertise in the fields of psychiatry and suicidology. He claims no expertise in the areas of pharmacology (the science of the composition, uses and effects of drugs), epidemiology (the science of the incidence, distribution and etiology of disease) or toxicology (the science of poisons, their effect and treatment).

■ Dr. Maltsberger reviewed the autopsy reports on Espinoza and the chil-

dren, her medical records, a letter from her psychiatrist providing a chronology of her treatment, and transcripts of depositions of her parents, her ex-husband, her social worker and others. Dr. Maltsberger performed a "psychological autopsy" [2] by reviewing this extensive material about Espinoza's life and, based on his knowledge about psychosocial stressors and suicide and evidence that Prozac can cause suicidal ideation, concluded that Prozac was a contributing cause of Espinoza's suicide. *See* Maltsberger Report (Doc. 85).[3] He explained:

> Prozac disinhibited her, ... it was because of the Prozac that she had poor self-control and impulsivity and difficulty controlling aggression over a stretch of time. I think that what she did in those states was harmful to her self-respect and that as she quieted down somewhat, which she did, the effect of the Prozac disinhibition would have deepened her shame and lowered her very low self-respect even more so that the Prozac experience for her became one of several contributing causes to her suicide.

Maltsberger Dep. at 131 (Doc. 106, Ex. 2).

## II. *Discussion*

### A. *Summary Judgment Standard*

Summary judgment should be granted when "there is no genuine issue as to any material fact, and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This rule places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affi-

---

**2.** The psychological autopsy is a generally accepted methodology for trying to determine what led to a suicide. J. John Mann, M.D. Dep. at 30 (in *Miller v. Pfizer,* No. 99–2326 KHV, 1999 WL 1063046 (D.Kan.)) (Doc. 106, Ex. 5).

**3.** Dr. Maltsberger's report does not specifically address a causal connection between Espinoza's ingestion of Prozac and the deaths of the children.

davits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

When a motion for summary judgment is made and so supported, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A factual dispute between the parties will not defeat a properly supported motion for summary judgment unless the dispute concerns a *"genuine issue of material fact." Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated against a party who, "after adequate time for discovery and upon motion, ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

In ruling on a motion for summary judgment "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. It is not the court's function to make credibility determinations, weigh evidence, or draw inferences from the facts, *id.,* but only evidence that would be admissible at trial will be considered. *See Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997).

### B. The Daubert Motion

The instant case is one of many actions undertaken by family members of suicide victims against the manufacturers of SSRIs. *See, e.g., Winkler v. Eli Lilly & Co.,* 101 F.3d 1196, 1198 (7th Cir.1996) (hundreds of plaintiffs have attempted to sue Eli Lilly for injuries allegedly caused by ingesting Prozac). In recent years defendant drug manufacturers have repeatedly and often successfully challenged the admissibility of expert testimony concerning a causal relationship between SSRIs and suicide. *See Miller v. Pfizer Inc.,* 196 F.Supp.2d 1062, (D.Kan.2002) ("Zoloft;" plaintiffs' expert's opinion on general and specific causation excluded); *Cloud v. Pfizer Inc.,* 198 F.Supp.2d 1118 (D.Ariz.2001) (same; summary judgment for defendant granted); *Smith v. Pfizer Inc.,* No. CIV.A. 98–4156–CM, 2001 WL 968369 (D.Kan. Aug.14, 2001) (same). *But see Tobin v. Smithkline Beecham Pharm.,* 164 F.Supp.2d 1278 (D.Wyo.2001) ("Paxil;" plaintiffs' expert's testimony admissible, supported jury verdict; manufacturer's motion for new trial denied).

■ The parties agree that expert testimony is required to establish causation in this case. *See Deyo v. Kinley,* 152 Vt. 196, 205, 565 A.2d 1286, 1291 (1989); *Burton v. Holden & Martin Lumber Co.,* 112 Vt. 17, 19, 20 A.2d 99, 100 (1941). *See also Graham v. Canadian Nat. Ry.,* 749 F.Supp. 1300, 1318 (D.Vt.1990). The party who proffers the expert testimony has the burden of establishing its admissibility "by a preponderance of proof." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 n. 10, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Plaintiffs also acknowledge that they must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case. *See, e.g., Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 928 (8th Cir.2001); *In re Joint E. & S. Dist. Asbestos Litig.,* 52 F.3d 1124, 1131 (2d Cir.1995); *Miller v. Pfizer Inc.,* 196 F.Supp.2d 1095, 1123–24 (D.Kan. 2002); *Amorgianos v. Nat. R.R. Passenger Corp.,* 137 F.Supp.2d 147, 161 (E.D.N.Y. 2001). *See also* Restatement (Second) of Torts § 433B cmt. b (1977) (if a particular act might be expected to produce a partic-

ular result, and if that result in fact followed, the conclusion may be justified that the causal relation exists). *But see* John G. Culhane, *The Emperor Has No Causation: Exposing a Judicial Misconstruction of Science*, 2–Fall Widener L.Symp.J. 185, 197 (1996) (arguing for synergistic consideration of general and specific causal connections).

Lilly contends that Dr. Maltsberger's opinions are inadmissible to prove either general or specific causation under the United States Supreme Court ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 592–93, 113 S.Ct. 2786, and Rule 702 of the Federal Rules of Evidence. Rule 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

In order to constitute scientific knowledge, proposed testimony "must be derived by the scientific method ... [and] supported by appropriate validation—*i.e.,* 'good grounds.'" *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. In other words, the evidentiary reliability of proposed testimony depends upon its scientific validity. *See id.,* 509 U.S. at 590 n. 9, 113 S.Ct. 2786. In order to assist the trier of fact, proposed expert testimony must also be relevant, that is it must be sufficiently tied to the facts of the case to "make the existence of any fact that is of consequence to the determination of the action more probable

or less probable than it would be without the evidence." Fed.R.Evid. 401. *See Daubert,* 509 U.S. at 591, 113 S.Ct. 2786; *Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 184 (2d Cir.2001). This consideration has been described as "fit." *See Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. Rule 702 also requires that a witness be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R.Evid. 702.

Proffered testimony must be based upon "sufficient" facts or data. *Id.* As the Advisory Committee Notes to the 2000 Amendments to Rule 702 explain, the sufficiency analysis is quantitative rather than qualitative, and the phrase "facts or data" encompasses the reliable opinions of other experts and hypothetical facts that are supported by the evidence. *See id.* advisory committee's note. The testimony must be the product of reliable principles and methods that have been reliably applied to the facts of the case. Fed.R.Evid. 702.

In *Daubert* the United States Supreme Court set forth a non-exclusive list of four considerations that may bear on whether a theory or technique has sufficient scientific validity to constitute reliable evidence: (1) "whether it can be (and has been) tested," *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786; (2) "whether it has been subjected to peer review and publication," *id.;* (3) as to a scientific technique, its "known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation," *id.,* 509 U.S. at 594, 113 S.Ct. 2786 (citation omitted); and (4) "widespread acceptance." *Id. See also Campbell,* 239 F.3d at 185. The Court emphasized that the inquiry into scientific validity is a flexible one, *see Daubert,* 509 U.S. at 594, 113 S.Ct. 2786, and courts applying *Daubert* have found other factors pertinent or have recognized that the *Daubert* factors do not apply to all types of

expert testimony. *See, e.g., Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150–51, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 687 (8th Cir.2001); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 n. 8 (3d Cir.1994)); *Zuchowicz v. United States,* 140 F.3d 381, 387 (2d Cir.1998); *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir.1996); *Ambrosini v. Labarraque,* 101 F.3d 129, 139–40 (D.C.Cir.1996); *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) *See also* Joseph Sanders, *Scientific Validity, Admissibility, and Mass Torts after Daubert,* 78 Minn.L.Rev. 1387, 1428 (1994) (scientific validity encompasses a complex set of concepts and is always a matter of degree).

Other factors found to be relevant include: (1) whether the expert proposes to testify about matters derived from research independent of the litigation, *see Daubert,* 43 F.3d at 1317; (2) whether the expert has adequately accounted for obvious alternative explanations, *see Ambrosini,* 101 F.3d at 140; (3) whether the expert has employed the same level of intellectual rigor in the courtroom as in the relevant field of expertise, *see Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167; (4) the non-judicial uses to which the method has been put, *see Elcock v. Kmart Corp.,* 233 F.3d 734, 746 (3d Cir.2000); and (5) whether the expert's discipline itself lacks reliability, *see Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167. Commentators have suggested still more factors. *See, e.g.,* C. Robert Showalter, *Distinguishing Science from Pseudo–Science in Psychiatry: Expert Testimony in the Post–Daubert Era,* 2 Va.J.Soc.Pol'y & L. 211, 235–37 (1995) (*inter alia,* comprehensiveness of disclosure of information upon which opinion is based; disclosure of theoretical basis for opinion); Edward J. Imwinkelried, *The Next Step after Dau-*

*bert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony,* 15 Cardozo L.Rev. 2271, 2290 (1994) (experiential basis for nonscientific opinions should be evaluated for quantity and similarity).

■ Overall, the Supreme Court emphasized the "liberal thrust" of the Federal Rules of Evidence, favoring admissibility of expert opinion testimony. *Daubert,* 509 U.S. at 588, 113 S.Ct. 2786. Its *Kumho Tire* decision confirmed that *Daubert's* general holding—trial judges must perform a "gatekeeping" function in determining the admissibility of expert testimony—"applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire,* 526 U.S. at 141, 119 S.Ct. 1167 (citing Fed.R.Evid. 702). At the same time it clarified however that the "specific factors that *Daubert* mentioned" need only be considered "when doing so will help determine that testimony's reliability." *Id.* A trial judge enjoys "broad latitude when it decides how to determine reliability." *Id.* at 142, 119 S.Ct. 1167 (emphasis deleted).

■ The reliability of expert opinion testimony based on psychiatric or psychological observation and analysis does not readily lend itself to evaluation using the specific *Daubert* factors. *See Jenson v. Eveleth Taconite Co.,* 130 F.3d 1287, 1297–98 (8th Cir.1997) (questioning the fit of the *Daubert* factors to psychological evidence but finding evidence admissible under *Daubert's* flexible approach). *Cf. Elcock,* 233 F.3d at 747 (court reviewing social science evidence of vocational rehabilitation could only roughly analogize to *Daubert* factors). *See also* C. Showalter, *supra,* at 228 ("much scientific data, including that derived from behavioral sci-

ence analyses of both aggregate data and individuals undergoing psychiatric or psychological evaluation, simply cannot be measured by the *Daubert* standards"); Daniel W. Shuman, *What Should We Permit Mental Health Professionals to Say About "The Best Interests of the Child"?: An Essay on Common Sense, Daubert, and the Rules of Evidence,* 31 Fam.L.Q. 551, 561 (1997) (discussing notion that courts should scrutinize mental health expert testimony differently than testimony based on chemical, biological, or other physical sciences); William M. Grove & R. Christopher Barden, *Protecting the Integrity of the Legal System: The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses,* 5 Psychol.Pub.Pol'y & L. 224, 238 (1999) (given rigorous adherence to the *Daubert* factors, a significant portion of mental health-related social science testimony would not be admissible); Michael H. Gottesman, *Admissibility of Expert Testimony after Daubert,* 43 Emory L.J. 867, 875 (1994) (psychiatrists' assessments of mental capacity are neither "testable" nor able to be examined for "error rate").

■ The Court does not find the four *Daubert* factors particularly helpful in determining the reliability of Dr. Maltsberger's opinion testimony. Indeed, if the four factors were applied to Dr. Maltsberger's specific causation testimony, the testimony would fail the test. The theory that ingestion of Prozac was a contributing factor in Espinoza's death cannot be tested; it has not been subjected to peer review and publication; the rate of error is unknown and unknowable; and the theory does not have general acceptance. Strict adherence to traditional tests for reliability of "hard science" would probably preclude Dr. Maltsberger's general causation testimony as well. *But see* Carl F. Cranor & David A. Eastmond, *Scientific Ignorance*

*and Reliable Patterns of Evidence in Toxic Tort Causation,* 64 Law & Contemp.Probs. 5, 48 (2001) (noting need for courts to recognize a wide variety of reliable scientific evidence than will support inferences about the toxicity of substances); Carl F. Cranor et al., *Judicial Boundary Drawing and the Need for Context–Sensitive Science in Toxic Torts after Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 16 Va.Envtl.L.J. 1, 26, 72 (1996) (decrying courts' use of "cookbook" rules to determine admissibility; calling for standards that "provide roughly equal protection to avoiding both legal false positives and legal false negatives"). The Court's task however is not to apply a rigid checklist to proposed opinion testimony, but to determine if it is based upon sufficient facts or data and is the product of reliable principles and methods, and if the principles and methods have been applied reliably to the facts of the case. Fed.R.Evid. 702. With these principles in mind, the Court examines the proposed testimony of Dr. Maltsberger.

■ Dr. Maltsberger makes no claim to be expert in pharmacology, epidemiology, or toxicology. A physician, or psychiatrist, need not be a specialist in a particular field in order to qualify as an expert, however. *See McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995). The issue is whether the expert has the *relevant* "knowledge, skill, experience, training, or education" to assist the jury in determining a fact in issue. Fed.R.Evid. 702. Dr. Maltsberger's credentials and experience amply qualify him to testify concerning the cause or causes of suicide.

Lilly contends that Dr. Maltsberger's general causation opinion, to the extent that it is based on case reports and clinical experience, is not reliable and therefore not admissible. Specifically it argues that his methods do not satisfy the factors set

forth in *Daubert* and its progeny: that they have not been tested; are not generally accepted in the medical and scientific community; have not been subjected to peer review; have an unknown rate of error; are not employed outside the courtroom; and do not derive from research independent of SSRI litigation. Lilly also contends that Dr. Maltsberger's general causation testimony does not "fit" the facts of this case, and is therefore not relevant. Consequently, Lilly argues, Dr. Maltsberger's opinion on specific causation is neither relevant nor reliable.

Dr. Maltsberger stated that he used inductive reasoning in reaching his opinions on both general and specific causation. Maltsberger Decl. (Doc. 120, Ex. C). "By that method you observe a large number of cases, and from what you observe, you draw certain inferences." Maltsberger Dep. at 144. In his process of inductive reasoning he stated that he employed "Koch's postulates" or, their equivalent in modern epidemiological research, the "Bradford Hill criteria," a set of conditions which are useful in assessing general causation.[4] Maltsberger Decl.; *Reference Manual on Scientific Evidence* 376–79 (2d ed.2000).

Lilly takes issue with Dr. Maltsberger's utilization of the Bradford Hill factors, and questions whether he in fact did employ them. Such a dispute would ordinarily be for a jury to resolve. *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 (vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof enable jury to weigh shaky but admissible evidence); *Ambrosini*, 101 F.3d at 141 (credibility of expert and persuasiveness of scientific study were for fact finder).

In addition, Dr. Maltsberger relied on two case report discussions, the Teicher article and a 1991 article in the Journal of Clinical Psychiatry describing three cases in which patients who had previously made serious suicide attempts while taking Prozac again took Prozac (with informed consent) and again developed suicidal ideation. Anthony J. Rothschild, M.D., and Carol A. Locke, M.D., *Reexposure to Fluoxetine After Serious Suicide Attempts by Three Patients: The Role of Akathisia*, 52 J.Clin. Psychiatry 491 (1991). *See* Maltsberger Dep. at 73–5. When they had taken Prozac previously they had developed severe akathisia, and they stated that the development of this syndrome precipitated their suicide attempts. The akathisia and suicidal thinking abated upon discontinuing Prozac or adding an anti-anxiety drug to the treatment regime. *See* Rothschild & Locke at 491.

The authors observed this emergence of suicidal ideation secondary to akathisia in 3 of 1500 patients treated with Prozac, or 0.2%. Conservatively, they did not claim a causal relationship between Prozac and suicidal ideation. The article described a causal connection between Prozac and akathisia, and an association between akathi-

---

**4.** Bradford Hill's factors are: (1) temporality; (2) strength of association; (3) consistency of association; (4) specificity; (5) biological gradient, or dose-response relationship; (6) biological plausibility; (7) coherence, or consistency with known facts; (8) experimental evidence; and (9) analogy. *See* Austin Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965). *See also Reference Manual* at 376–79; *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d at 1128. Bradford Hill warned that the criteria could not prove or disprove causality, but were designed to assist the scientist in determining whether there was an explanation for an association equally or more likely than cause and effect. *See Reference Manual on Scientific Evidence* 376 n. 113 (2d ed.2000).

sia and suicidal ideation. *See id.* at 492–93.

Dr. Maltsberger also relied on a recent article in the British Journal of Psychiatry in which the authors compared the rates of "deliberate self-harm" between patients who had been prescribed a tricyclic antidepressant and patients who had been prescribed an SSRI such as Prozac. Stuart Donovan et al., *Deliberate Self-harm and Antidepressant Drugs,* 177 Brit.J. Psychiatry 551 (2000). Although the authors found significantly more occasions of deliberate self-harm occurred following the prescription of an SSRI than a tricyclic antidepressant, the authors cautioned that establishing a cause and effect as opposed to an associational relationship between SSRIs and deliberate self-harm or attempted suicide was "almost impossible." *Id.* at 555. The authors noted, for example, that SSRIs may be prescribed to patients who are at greater risk for suicide because SSRIs are less likely to be fatally toxic in overdose, perhaps accounting for the link between SSRIs and higher rates of deliberate self-harm. *Id.* at 554.

The psychiatric community acknowledges a controversy concerning whether the observed association between SSRI ingestion and suicide or violent behavior is causal. *See* Maltsberger Decl. at 6. *See also* J. John Mann and Shitij Kapur, *The Emergence of Suicidal Ideation and Behavior During Antidepressant Pharmacotherapy,* 48 Arch.Gen. Psychiatry 1027, 1027 (1991); Rothschild & Locke, 52 J.Clin. Psychiatry at 491; Ronald W. Maris et al., *Comprehensive Textbook of Suicidology* 393–94, 401–02 (2000). None of the published material submitted to the Court however goes so far as to opine that SSRIs in general or Prozac in particular trigger suicidal thoughts or violent behavior. This of course is not determinative of whether an opinion indicating a causal link is admissible evidence. *See, e.g., Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996) (relevant expert evidence admissible even if particular methods are not yet accepted as canonical in scientific community). *See also* Erica Beecher–Monas, *The Heuristics of Intellectual Due Process: A Primer for Triers of Science,* 75 N.Y.U.L.Rev. 1563, 1591–92 (2000) (criticizing any requirement that each study proffered by an expert support entirety of expert's hypothesis in order for testimony to be admissible).

Although Dr. Maltsberger testified at deposition that he was generally familiar with the range of scientific literature on the issue of SSRIs and violent or suicidal behavior, he did not discuss the methodology or his agreement or disagreement in any detail. The medical and scientific literature that disagrees with or contradicts Dr. Maltsberger's opinion that Prozac can cause suicide or violent behavior did not factor into Dr. Maltsberger's opinion on general or specific causation. *See* Maltsberger Dep. at 68–82; 109–10. Simply stating without discussion that this material carried no weight with him does not constitute solid support for his contrary opinion. *See Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 203 (4th Cir.2001) (rejecting articles as unpersuasive is insufficient grounds for contrary opinion). Nonetheless, these deficiencies could more than adequately be explored in cross-examination, allowing a jury to judge the strength or weakness of the testimony. *See Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

Whether or not Dr. Maltsberger's general causation opinion is sufficiently reliable to be admissible, however, the Court is forced to conclude that his opinion is inadmissible under *Daubert* and Rule 702 because it does not "fit" the facts of this case. If Dr. Maltsberger's opinion that

Prozac can cause suicide and violent behavior passes a reliability scrutiny, Plaintiffs have failed to show that this opinion supports a conclusion that in Espinoza's case Prozac caused disinhibition followed by shame and loss of self-respect so profound as to cause her to commit suicide. There is simply "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). In other words, Plaintiffs have failed to satisfy Rule 702's third factor: that "the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

■ In reaching this conclusion the Court stresses that it is not holding that Dr. Maltsberger's methods cannot provide a reliable basis for an expert opinion on causation, but that in this particular case the information upon which Dr. Maltsberger based his opinion could not reliably determine the cause of this particular double homicide-suicide. *See Kumho Tire*, 526 U.S. at 154–55, 119 S.Ct. 1167 (issue was not reasonableness in general of expert's method but reasonableness of using approach to draw conclusion concerning particular matter at issue). Nor does the Court find fault with Dr. Maltsberger's conclusion in this case, but with the application of his methods. *See Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (focus must be solely on principles and methodology, not on conclusions they generate). Nevertheless "[a] court 'must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir.2000) (quoting *Heller v. Shaw Inds., Inc.*, 167 F.3d 146, 153 (1999)), cert. denied, 532 U.S. 921, 121 S.Ct. 1357, 149 L.Ed.2d 287 (2001). *See also Joiner*, 522 U.S. at 146, 118 S.Ct. 512 ("conclusions and methodology are not entirely distinct from one another").

■ The problem is that Dr. Maltsberger's conclusion was not adequately supported by the data on which he relied. Dr. Maltsberger relied on his clinical experience, but he has no direct clinical experience with patients who have experienced newly emergent suicidal thoughts, attempted or committed suicide or become violent while taking Prozac or any SSRIs. The scientific literature on which he relied refused to opine on causation.

More importantly, however, the Plaintiffs have not shown that Dr. Maltsberger has any data, from clinical experience, scientific literature or elsewhere, that SSRIs trigger suicidal thoughts or violent behavior in individuals who are not contemporaneously experiencing the agitation of symptoms of akathisia, mania, hypomania or disinhibition. Espinoza did not suffer from any of these conditions when she committed her violent acts. Dr. Maltsberger believes that an individual in whom an SSRI has produced disinhibition can deteriorate psychologically over time to a point where her self-respect is so eroded that she may calmly and not impulsively plan to kill her children and herself. Given Dr. Maltsberger's credentials and experience, his belief is not to be lightly dismissed, but it remains just that, a belief, "an insightful, even an inspired hunch ... that ... lacks scientific rigor." *Rosen*, 78 F.3d at 319.

In this case it is thus not necessary to decide whether case studies, clinical experience, inductive reasoning and anecdotal evidence can be combined to form a proper foundation for an opinion on causation, because, regardless, the information these sources provided did not adequately support Dr. Maltsberger's opinion. *See Joiner*, 522 U.S. at 144, 118 S.Ct. 512 (issue was not whether expert opinion could be supported by animal studies, but whether

expert opinion could be sufficiently supported by animal studies that were substantially dissimilar to the facts). *See also Kumho Tire,* 526 U.S. at 153–54, 119 S.Ct. 1167 (issue was not general reasonableness of expert's methodology, but reasonableness of using this approach to draw particular conclusion); *Heller,* 167 F.3d at 159 (expert conclusion must "fit" or reliably flow from the data and methodology).[5]

█ Even if the available information concerning causal links between (1) SSRIs; (2) akathisia, mania, hypomania, mixed states or disinhibition; and (3) suicidal thoughts or violent behavior is sufficiently reliable to be admissible, it is not probative of whether Prozac could cause suicide or violent behavior in one who appeared to have calmly planned her actions. The available information is connected to the circumstances surrounding the deaths in this case "only by the *ipse dixit* of the expert." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512. Accordingly, the opinion and testimony of Dr. Maltsberger that Prozac can and did trigger disinhibition succeeded over time by shame and loss of self-respect so profound as to cause murder and suicide is inadmissible as failing to meet the standards of Rule 702 and *Daubert.*[6] Without testimony that Prozac contributed to the deaths in this case, testimony about a causal connection in general between SSRIs and suicide or violent behavior, even if reliable, will not be helpful to the jury. The opinion and testimony that Prozac can cause suicide and violent behavior is therefore excluded as well.

## C. The Proximate Cause Motion

█ Under Vermont law,[7] to prove a "failure to warn" case, a plaintiff "must provide evidence from which a reasonable jury could find: (1) that defendant owed a duty to warn plaintiff; (2) lack of warning made the product unreasonably dangerous, hence defective; and (3) defendant's failure to warn was the proximate cause of plaintiff's injury." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995). Proximate cause in a failure to warn case is typically shown by means of a rebuttable presumption. If a plaintiff can demonstrate that the manufacturer had a duty to warn and failed to provide an adequate warning, a causal presumption arises that had an adequate warning been provided, the user would have read and heeded the warning. *See Town of Bridport v. Sterling Clark Lurton Corp.,* 166 Vt. 304, 308, 693 A.2d 701, 704 (1997). A defendant of course may present evidence to overcome the presumption. *See id.*

---

**5.** This Court previously addressed the admissibility of expert testimony on causation in a failure to warn case in *Jugle v. Volkswagen of America, Inc.,* 975 F.Supp. 576, 581 (D.Vt. 1997). In that case where the Court ruled the expert testimony admissible under Rule 702, the "fit" between the expert testimony on the cause of an automobile fire and the underlying methodology was not challenged. *See Jugle v. Volkswagen of Am., Inc.,* 975 F.Supp. 576, 581 (D.Vt.1997).

**6.** The Court notes that Dr. Maltsberger's specific causation opinion testimony was ruled admissible in *Tobin v. Smithkline Beecham Pharm.,* 164 F.Supp.2d 1278, 1289–90 (D.Wyo.2001) and *Smith v. Pfizer Inc.,* No.

CIV.A. 98–4156–CM, 2001 WL 968369, at *7 (D.Kan. Aug.14, 2001). In both of these cases the decedent was apparently akathisic or had akathisic symptoms at or near the time of his death. *See Tobin,* slip op. at 4; *Smith,* 2001 WL 968369, at *1, 6. The cases thus do not offer support for the admissibility of a causation opinion unrelated to the association between violent suicides, akathisia and SSRIs.

**7.** Because jurisdiction is based on diversity, the Court applies the law of the forum state to the determination of Lilly's summary judgment motion for lack of proximate cause. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ To prove proximate cause in this case, Plaintiffs must show that the lack of an appropriate warning concerning Prozac was a cause-in-fact of their injuries. "A finding of proximate cause depends upon a showing that a negligent act or omission was a cause-in-fact of the alleged injury." *Tufts v. Wyand,* 148 Vt. 528, 530, 536 A.2d 541, 542 (1987).[8] To prove that a negligent act was a proximate cause of death one must show (1) the negligence led to the death in a natural and uninterrupted sequence of events; (2) the negligence was a substantial factor in bringing about the death; and (3) the death would not have happened if that defendant had not been negligent. *See Rooney v. Med. Ctr. Hosp. of Vt., Inc.,* 162 Vt. 513, 523, 649 A.2d 756, 762 (1994). *See also Gilman v. Towmotor Corp.,* 160 Vt. 116, 120, 621 A.2d 1260, 1262 (1992). More than one act of negligence, each a proximate case, may combine to produce an injury, however. *See Rooney,* 162 Vt. at 524, 649 A.2d at 762. A defendant may be found liable if its negligence was a substantial factor in causing the injury, even if another cause was acting at the same time. *See id.*

■ Assuming that Plaintiffs could prove that Lilly has a duty to warn, they cannot show that, had Espinoza heeded the warning, she and her children would not have died. As discussed in the previous section, Plaintiffs must meet their burden of proving that ingestion of Prozac caused the homicides and suicide in this case by offering expert testimony. That expert testimony has been ruled inadmissible under *Daubert.* Without expert testimony that Prozac caused the deaths, it is not possible to show that any inadequacy

in warning about Prozac was a substantial factor in bringing about the deaths.[9]

### III. Conclusion

Lilly's Motion for Summary Judgment on the Ground of Lack of Admissible Expert Testimony on Causation (Doc. 101) is **GRANTED.** Lilly's Motion for Summary Judgment on the Ground of Lack of Proximate Cause (Doc. 96) is **GRANTED.**

**Case closed.**

8. A strict product liability failure to warn case is analyzed using negligence principles. *See McCullock,* 61 F.3d at 1044.

9. Again, *Jugle* is inapposite. In *Jugle,* summary judgment on a failure to warn claim

was not warranted because the admissible evidence created a factual dispute over causation. *See Jugle,* 975 F.Supp. at 583. Here there is no factual dispute because the Plaintiffs have no admissible evidence of causation.